## TRADEMARK LICENSE AGREEMENT

THIS TRADEMARK LICENSE AGREEMENT (this "*Agreement*") by and between Republic Technologies (NA), LLC, a Delaware limited liability company with a place of business at 2301 Ravine Way, Glenview, Illinois 60025 ("*Licensor*") and Sream, Inc., a California corporation with a place of business at 12869 Temescal Canyon Road, Suite A, Corona, California, 92883 ("*Licensee*") is made and entered into August 20, 2019 (the "*Effective Date*").

WHEREAS, Licensee desires to utilize the Licensed Marks for commercial purposes in accordance with and subject to the terms and conditions of this Agreement.

WHEREAS, Licensee used the Licensed Marks in conjunction with the sale of the Products pursuant to the terms of a license agreement with Licensor's predecessor-in-interest.

NOW, THEREFORE, in consideration of the mutual covenants and conditions set forth herein, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), Licensee and Licensor (each, a "*Party*," and collectively, the "*Parties*") agree as follows.

### DEFINITIONS

"*Affiliate*" shall mean any corporation or other incorporated legal entity, present or future, which directly or indirectly controls or is controlled by, or is under common control with, a Party to this Agreement, through ownership or control of twenty-five percent (25%) or greater of the voting power of the shares or other means of ownership control, for as long as such ownership or control continues to exist.

"*Business Day*" shall mean any day other than a Saturday or Sunday on which commercial banks located in New York, U.S. are required by law to be open.

"*Gross Sales*" shall mean shall mean (i) the total wholesale invoice value of all Products' sales to retailers before deductions for operating expenses, cost of goods sold, taxes, interest, customer discounts, returns or allowances, minus (ii) the aggregate cost of shipping, freight and insurance charges for all Products sold, per calendar year.

"*Intellectual Property Rights*" shall mean any and all patents (and applications therefor), trademarks (and applications therefor), trade names, trade dress, logos, slogans, domain names, service marks (and other commercial product or service designations), mask works, copyrights, moral rights, trade secrets and other confidential business information (including technical information), other intellectual property rights or proprietary rights, ideas, concepts, know how, techniques, inventions, discoveries, improvements, documents, products, systems, practices, procedures, means, methods, designs, devices, programs, sui generis database rights, software, databases and data (whether in tangible or intangible form and whether or not stored, compiled or memorialized physically, electronically, graphically, photographically or in writing), together with all ideas, concepts, means, methods, designs, devices, programs, software, drawings, sketches and any other intellectual property or proprietary right recognized or protectable by any jurisdiction in the world, together with all registrations and applications for any of the foregoing and all goodwill associated with any of the foregoing. "Intellectual Property Rights" includes, but is not limited to,

subject matter that falls within the definition of patentable subject matter under the laws of the U.S. or any other jurisdiction or within the definition of copyrightable materials under the laws of the U.S. or any other jurisdiction.

"*Licensed Article(s)*" shall mean the glassware products and other products set forth on Schedule B.

"*Licensed Marks(s)*" shall mean those marks set forth on Schedule A.

"*Person(s)*" shall mean an individual or a limited liability company, corporation, partnership, trust, unincorporated organization, association or other entity.

"*Product(s)*" shall mean Licensed Articles bearing, sold or offered under any of the Licensed Marks and all related packaging.

"*Product Material(s)*" shall mean all content, advertising and marketing material, publicity and promotional material, sell sheets, sales and trade literature, web sites, signs, catalogs, press releases, point of sale materials, Product brochures, and any other material bearing or making reference to the Licensed Marks and/or the Products.

"*Sell-Off Period*" shall have the meaning set forth in Section 8.4.

"*Term*" shall have the meaning set forth in Section 8.1.

"*Territory*" shall mean the United States of America.

## AGREEMENT

1. **License**.

     1.1   Grant of License. Subject to all of the terms and conditions set forth in this Agreement, including, without limitation, Licensor's timely receipt of all payments due under this Agreement, as well as Licensee's strict compliance with all of this Agreement's quality control provisions and other requirements, Licensor hereby grants to Licensee the limited and non-transferable (except as set forth in Section 11.11) right and license to utilize the Licensed Marks to manufacture, package, distribute, promote, advertise, service, offer, provide, and sell Products in the Territory during the Term of this Agreement.

     1.2   Limited Scope of License.

     (a)   For clarity: (i) Licensor reserves the right to manufacture, distribute, and sell (and/or authorize third parties to do the same under license) the Products or other products labeled with the Licensed Marks that are in nature similar to, and/or competitive with, the Products, outside the Territory; and (ii) Licensor reserves the right to manufacture, distribute, and sell products labeled with the Licensed Marks other than the Products inside the Territory. With regard to the preceding subsection (i), Licensor shall use reasonable measures to require that authorized third parties maintain the brand image and price point of the Products, provided that the final and sole discretion on this issue shall remain with Licensor.

(b)    Any unauthorized use of the Licensed Marks (including any violation or breach of any of the limitations on license set forth below in Section 1.5 or the representation and warranty set forth in Section 1.6) or unauthorized sales of Products by Licensee outside of the Territory to any third party shall be grounds for immediate termination by Licensor, at Licensor's option, and shall obligate Licensee to the payment of damages in an amount equal to Two Thousand Five Hundred Dollars ($2,500) per each unauthorized sale transaction in addition to whatever other liabilities may be incurred by Licensee as a result of such unauthorized sales. Licensee hereby agrees and acknowledges that Licensor would be unduly prejudiced and that the measure of actual damages suffered by Licensor would be difficult to ascertain, in the event that Licensee sold Products outside the Territory. Therefore, Licensee agrees that the liquidated damages provision set forth herein is reasonable under the circumstances to protect Licensor's interests and that such damages shall be in addition to, and not in lieu of, any other remedies available to Licensor under this Agreement.

1.3    Exclusivity.  For so long as Licensee meets the minimum Gross Sales requirements as defined and set forth in Schedule D hereto, the grant of the license in Section 1.1 shall be exclusive. To the extent that Licensee fails to meet the minimum Gross Sales requirement in a particular year of the Term, Licensee shall have an opportunity to cure the shortfall by exceeding the minimum in the following year by the shortfall amount. If Licensee fails to cure the shortfall, the grant of the license in Section 1.1 shall no longer be exclusive.

1.4    Sublicenses; Subcontracting.  Licensee may not sublicense or subcontract any of the rights granted to it under this Agreement unless specifically agreed to in writing by Licensor in advance, which may be withheld by Licensor in its sole discretion, provided, that Licensor agrees that Licensee may subcontract its manufacturing operations only (without any sublicense to the Licensed Marks) to a third party located in the Territory and conducting the subcontracted manufacturing operations win the territory. Licensee shall be responsible for and liable for any and all damages or losses that are caused by any action or omission by any authorized or unauthorized subcontractors, vendors, or sublicensees. Notwithstanding anything to the contrary elsewhere in this Agreement, Licensee shall remain at all times fully responsible for the quality of the Products to be sold hereunder and Licensor shall, under no circumstances whatsoever, have any obligations, duties, or liabilities with respect to any approved subcontractors.

1.5    Limitations on License.  Licensee acknowledges and agrees that all rights to license the Licensed Marks are wholly owned by Licensor. Licensee shall neither acquire nor confer any right(s), license(s) or sublicense(s) to the Licensed Marks except as may be expressly granted in this Agreement, and all rights not expressly granted hereunder are reserved by Licensor. Unless otherwise specifically approved in advance in writing by Licensor, this Agreement does not grant Licensee the right or license (or the right to confer upon any other Person the right or license) to:

(a)    use any of the Licensed Marks as a part of a corporate or trade name, provided that Licensee may use the Licensed Marks on Product invoices to third parties;

(b)    grant any security interest in or to the Licensed Marks or this Agreement;

-3-

(c) co-brand, sub-brand, or otherwise use the Licensed Marks in connection with any other trademark, trade name, domain name, social media account or handle therefor;

(d) apply to or use, or confer upon any other Person the right to apply to or use, any of the Licensed Marks in connection with any goods; or

(e) register or seek to register any trademark, service mark, domain name, social media account or handle therefor, logo, business name, on-line social networking or media user name or other designation of origin comprised in whole or in part of, or otherwise confusingly similar to, any of the Licensed Marks.

1.6 No Other RooR Brand Rights. Licensee represents and warrants that it does not have any ownership, license or management rights in any RooR brand intellectual property, including, without limitation, any trademark, service mark, domain name, social media account or handle therefor, logo, business name, on-line social networking or media user name or other designation of origin comprised in whole or in part of, or otherwise confusingly similar to, any of the Licensed Marks.

1.7 Third-Party Licenses, Royalties and Fees. Without limiting the generality of any provision herein, Licensee shall have the sole responsibility to obtain and maintain, at its sole expense, all necessary third-party rights, licenses or agreements relating to any third party intellectual property or proprietary right embodied in the Products, any specifications or tooling therefor, or any functionalities, models, samples, demos, or prototypes thereof. Licensee shall timely pay all license fees, royalties, and/or other fees and expenses required to maintain such rights, licenses and agreements.

2. **Ownership of Licensed Marks**.

2.1 Ownership. Licensee acknowledges and agrees that: (a) there is substantial goodwill associated with the Licensed Marks; (b) Licensor and/or its Affiliates own all right, title, interest, and goodwill in and to the Licensed Marks, including without limitation in connection with the Licensed Articles; and (c) all use of the Licensed Marks pursuant to this Agreement shall inure exclusively to the benefit of Licensor and its Affiliates. Licensee agrees that it will do nothing inconsistent with such ownership and that all use of the Licensed Marks by Licensee shall inure to the benefit of and be on behalf of Licensor. Licensee agrees that nothing in this Agreement shall give Licensee any right, title or interest in the Licensed Marks other than the right to use the same in accordance with this Agreement, and Licensee agrees that it will not attack or otherwise challenge Licensor's rights in the Licensed Marks, the title of Licensor to the Licensed Marks, or the validity of the license to use the same hereunder.

2.2 Non-Circumvention of Licensor's Licensed Marks. Licensee further agrees not to use or seek to register, in any jurisdiction, any corporate trade name, trademark, service mark, or domain name resembling or confusingly similar (as determined by Licensor in its sole discretion) to the Licensed Marks, or that dilutes the Licensed Marks or any of Licensor's other marks. If any application for registration is, or has been filed in any country by Licensee that relates to any mark or domain name that, in the sole opinion of Licensor, is confusingly similar,

-4-

deceptive or misleading with respect to the Licensed Marks or any of Licensor's other marks, or that dilutes the Licensed Marks or any of Licensor's other marks, Licensee shall immediately cease use and, at Licensor's discretion, immediately abandon any such application or registration, or assign it to Licensor. Licensee will not alter, remove, deface or obscure any notice of trademark or other proprietary right on any Product bearing the Licensed Marks and will not add to any Product any other trademark or notice of any other proprietary right. In the event of any infringement, misappropriation or violation relating to the activities of Licensee or any of its employees, agents, representatives, or sales representatives, Licensee will, at its own cost, take all steps reasonably necessary to terminate any such infringement, misappropriation or violation. Licensee agrees that the use of the Licensed Marks by Licensee shall remain at all times under the exclusive control of Licensor.

   2.3 Licensee's Right to Enforce the Licensed Marks. Throughout the Term of this Agreement, including all renewals, Licensor, its affiliates and their designee(s) shall have the right, in their sole discretion, to pursue infringements or counterfeits of the Licensed Marks and any trademarks, trade names, domain names or social media accounts associated therewith, except and solely to the extent that Licensor grants Licensee certain such rights as set forth in this Section 2.3.

   (a) Licensee agrees to assist Licensor, its affiliates, and respective their representatives and designee(s) to the extent necessary to protect any of Licensor's and its affiliates' rights in the Licensed Marks and any trademarks, trade names, domain names or social media accounts associated therewith, or in enforcing settlement or order made in connection with such a proceeding. Licensee acknowledges and agrees that such assistance may include, without limitation: (i) assistance in the filing and prosecution of trademark, copyright or domain name registration applications or transfers; (ii) the publication of notices; and (iii) the doing of any other act or acts with respect to the Licensed Marks and any trademarks, trade names, domain names or social media accounts associated therewith, including the prevention of the use thereof by an unauthorized person, firm or corporation, which in the sole discretion of Licensor may be necessary or desirable under any law, regulation or decree of any jurisdiction(s).

   (b) Notwithstanding the foregoing subsection (a), Licensor authorizes Licensee to continue its current program for identifying and taking action against third party infringements and counterfeits of Products in the Territory, including by way of contingency arrangements wherein counsel shall be entitled to a lien on recoveries. Licensee represents and warrants that Licensee has not settled and will not settle any third party infringement actions, without Licensor's express prior written approval, if such settlement in any form or manner affects Licensor's ownership or proprietary rights in or use of the Licensed Marks. Licensee acknowledges and agrees that Licensor has the right to direct the actions with regard to or assume control of any individual action at any time, if Licensor believes, in its sole discretion, that Licensor's ownership rights in the Licensed Marks are jeopardized for any reason or if such direction or control is required for other strategic reasons.

   (c) Prior to the Effective Date, Licensee shall provide Licensor a detailed and comprehensive report listing all current actions to which it is party, including, for each action, the law firm(s) or attorney(ies) involved, the counterparty to the action, the out-of-pocket or contingency arrangements exposure through the date of the report, the filed or settlement

status of the action (including the settlement monies paid and owed if settled), and the overall status of the action. Following the first report due prior to the Effective Date, Licensee shall provide such report to Licensor on an ongoing monthly basis on or before the fifteenth (15) day of each month. The Parties shall periodically review and discuss Licensee's overall enforcement strategy and program. Licensor has the right at any time and for any reason to require that upon written notice Licensee terminate its program in its entirety, with Licensor to assume control and direction of all actions; provided, however, that: (i) for all actions in progress as of the date of Licensor's notice (meaning settled or in litigation), Licensee shall retain responsibility and liability for such actions, including the right to collect settlement monies and damages, provided that any settlements remain subject to Licensor's approval as set forth above in subsection (b); and (ii) for all actions for which litigation has not commenced, Licensor shall assume responsibility and liability for such actions, including the right to collect settlement monies and damages, provided that Licensor shall compensate Licensee for its reasonable out-of-pocket costs (i.e., investigator costs and cost of counterfeit goods purchased) incurred with respect to such actions.

(d)     From and after the Effective Date, Licensee will contemporaneously notify Licensor in writing of any infringement, misappropriation or violation of any trademark or other proprietary right of Licensor that comes to Licensee's attention and/or of any actions or litigation that Licensee has commenced to protect against third party infringements and counterfeits of Products in the Territory.

3.     **Quality Standards and Product Approval**.

3.1     Standards of Use. Licensee shall use the Licensed Marks and manufacture Products in accordance with Licensor's standards set forth in the Usage Policy attached hereto as Schedule C and incorporated herein by reference. Licensor reserves the right to change or modify any of the terms and conditions contained in the Usage Policy at any time in its sole discretion. Any changes or modifications will be effective upon fifteen (15) days' written notice to Licensee. Licensee's continued use of the Licensed Marks following notice of revisions of the Usage Policy will constitute Licensee's acceptance of such changes or modifications. The foregoing notwithstanding, if Licensee believes that any such changes or modifications impose an unreasonable burden on Licensee in the performance of its obligations hereunder, then Licensee shall notify Licensor in writing within fifteen (15) days of receipt of the changes or modifications by Licensor, of Licensee's reasons for asserting that Licensor's changes or modifications are commercially unreasonable and the Parties shall then discuss in good faith any possible revisions to the changes or modifications that Licensor is willing to make to the Usage Policy to address Licensee's concerns. Licensee agrees not to use any other trademarks, service marks, designs, logos, slogans or color schemas in combination with any of the Licensed Marks without the prior written approval of Licensor or as otherwise outlined herein. Licensee agrees that he will not sell any Products bearing the Licensed Marks unless such Products strictly adhere to the Usage Policy.

3.2     Compliance with Law. As an integral part of this quality control, Licensee agrees that the Products bearing the Licensed Marks shall be of the highest quality available and shall, at a minimum, be sourced, manufactured imported, sold, labeled, packaged, distributed, offered, provided, serviced, promoted and advertised in accordance with all applicable laws and regulations of the jurisdictions where Products are manufactured, sourced, distributed, offered, provided, and sold or any instrumentalities or political subdivisions thereof.

-6-

3.3 RooR Tech Products. All Products sold under the brand RooR Tech (the "*Tech Licensed Marks*") shall be of superior craftsmanship quality, using high end raw materials and shall be of quality at least equal to or superior to other Products sold under the Licensed Marks. At a minimum, all Product sold under the Tech Licensed Marks (a) shall use Schott glass and Lenz laborgasinstrumente ground fittings and joints, (b) may use Chinese colored tubing, (c) shall utilize "in-tube" filtration systems, (d) shall not include carbon adapter, and (e) shall remain overall distinctive with notable styling differences from other Products. Pricing for all Products sold under the Tech Licensed Marks shall reflect the standard of quality set forth herein.

3.4 Inspection and Approval Rights. Licensee acknowledges that Licensor has the right to inspect the quality and nature of the Products bearing the Licensed Marks, and to approve or reject those Products, for whatever reason, including but not limited to whether, in the Licensor sole determination and discretion, Licensee is in compliance with Licensor's quality control standards. Notwithstanding the foregoing, Licensor agrees that compliant glassware Products currently being manufactured as of the Effective Date can continue to be manufactured and sold. Licensee agrees to collect, maintain and furnish to the Licensor, at Licensor's request, representative samples of Products and any marketing materials bearing the Licensed Marks to assure conformance with all quality standards. Licensor or any designee that has been previously identified in writing by Licensor and disclosed to Licensee as an authorized designee ("*Authorized Designee*"), shall have the right during regular business hours to inspect Licensee's premises, inventories, manufacturing facilities and accounting books and records at any time, in order to determine whether Licensee is adhering to the requirements of this Agreement relating to the use of the Licensed Marks. Licensee shall permit Licensor or any Authorized Designees to access its premises, facilities and/or books and records during regular business hours. If Licensor determines that Licensee is not in compliance with the standards set forth in this Section 3, Licensee shall immediately cure the non-compliance or discontinue such non-conforming use, at Licensor's sole discretion.

3.5 Records and Audit. Licensee shall maintain separate corporate, financial and accounting books and records for the Products bearing the Licensed Marks at all times during the Term. Licensee agrees to maintain correct and complete financial books and accounts for its business, which shall be prepared in accordance with United States Generally Accepted Accounting Principles and shall correctly reflect all of the transactions, items of income and expense and all assets and liabilities of Licensee's business as it relates to the Products. Licensor or any certified public accountant designated by Licensor shall be permitted to conduct an audit of the business of Licensee to determine Licensee's compliance with the terms and conditions of this Agreement, during regular business hours and upon forty-eight (48) hour written notice to Licensee, to ensure compliance with this Agreement and to assess Licensee's financial position at any time during the Term.

3.6 Approval of Product Material(s) and Product Literature. Licensee shall submit proposed Product Materials to Licensor for approval to ensure proper trademark use. All approvals of Product Materials shall be provided in Licensor's sole discretion, and Licensor may in its sole discretion direct Licensee to cease use of any Product Materials at any time upon written notice to Licensee.

4. **Representations and Warranties; Disclaimer of Warranty; Waiver**.

4.1     Licensee's Representations and Warranties.  Licensee represents, warrants and covenants to Licensor that:

(a)     it has full power and authority to enter into and deliver this Agreement and to lawfully perform all of its obligations hereunder;

(b)     at all times during the Term of this Agreement, and thereafter as required hereunder, Licensee shall maintain the necessary working capital and manufacturing facilities or relationships to perform all obligations of Licensee under this Agreement;

(c)     the Products shall be free from defects in design, manufacture, material and workmanship, and shall be fit and safe for the use(s) normally and reasonably intended;

(d)     the Products shall be of merchantable quality and shall be manufactured and shall perform in conformance with approved samples;

(e)     the Products (including their labeling and packaging) and Product Materials shall not violate or infringe any Intellectual Property Right of any third party or any other right of any third party, nor shall their offer, provision, resale or distribution;

(f)     Licensee has timely paid, and shall continue to timely pay, all license fees, royalties and/or other fees and expenses to third parties that are necessary to facilitate sourcing, manufacturing, packaging, distributing, providing, selling, repairing and servicing the Products;

(g)     it is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and is duly authorized to do business under the laws of such jurisdiction and each other jurisdiction in which such qualification is required;

(h)     this Agreement has been duly executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable in accordance with its terms; and

(i)     all Products shall be sourced, imported manufactured, processed, packaged, labeled, tagged, tested, certified, accurately marked, weighed, inspected, distributed, offered, provided, sold, repaired and serviced in compliance with all applicable industry standards and all applicable laws, treaties and regulations, including, without limitation, all laws and regulations relating to health, safety, environment, serial and identification numbers, manufacturing, packaging, labeling and country of origin designation, all toxic substances, pollution and hazardous materials, all waste, recycling and disposal laws and regulations, customs and importation requirements, and mandatory compliance certifications

4.2     Disclaimer of Warranty by Licensor.  Licensor delivers and licenses the Licensed Marks, "AS IS, "WHERE IS" AND "WITH ALL FAULTS."  Licensor makes no representation or warranty as to the condition, availability, strength, character, nature, capability, performance, suitability, "pedigree," source or other characteristic of any such item.

4.3    Waiver by Licensor. LICENSEE WAIVES AND RELEASES ALL RIGHTS AND REMEDIES OF LICENSEE AGAINST LICENSOR. INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, ECONOMIC OR CONSEQUENTIAL DAMAGES, COVER OR LOSS OF PROFIT, REVENUE OR USE.

5.    **Royalties**. During the Term and any permitted Sell-Off Period, in exchange for the license rights granted hereunder, Licensee shall pay Licensor seven percent (7%) of Gross Sales above Two Million Five Hundred Thousand Dollars ($2,500,000) in any calendar year of the Term.

6.    **General Payment Terms**. On or before the fifteenth (15th) day following the end of each month during the Term, Licensee shall submit a full, accurate, and detailed report of Total Gross Sales. Simultaneously with the provision of such report, Licensee shall remit any payment under Section 5 then due to Licensor by delivering immediately available funds. Interest shall accrue on any delinquent payments owed by Licensee at the rate of eight percent (8%) per annum.

7.    **Confidentiality**.

7.1    Obligations. Licensee recognizes that it has had, or will have, access to, and knowledge of, matters concerning the business of Licensor, including, without limitation, business, financial situation, products, customers, trade secrets, know-how, formulas, compositions of matter, inventions, techniques, processes, programs, diagrams, schematics, sales and marketing plans, all of which being of a confidential and proprietary nature ("*Confidential Information*"). Licensee covenants that it will (a) use such Confidential Information only in connection with fulfilling its obligations under this Agreement, (b) during the term of this Agreement and for a period of five (5) years thereafter, hold such Confidential Information in strict confidence and exercise due care with respect to its handling and protection of such Confidential Information, consistent with its own policies concerning protection of its own proprietary and/or trade secret information, and (c) disclose, divulge or publish the same only to such of its employees or representatives as are Qualified Personnel (as defined below) and to no other person or entity, whether for its own benefit or for the benefit of any other person or entity. Licensee further agrees to return all copies of all Confidential Information in its possession, control or custody immediately upon termination or expiration of this Agreement. As used herein, the term "*Qualified Personnel*" means such employees and representatives of Licensee who (x) have a need to know or have access the Confidential Information in order for such employees or representatives to carry out the purposes of this Agreement and (y) have executed nondisclosure agreements binding them not to use or disclose such Confidential information except as permitted herein.

7.2    Exceptions. The obligations contained in Section 7.1 will not apply to Confidential Information which (a) is or becomes public knowledge without the fault or action of Licensee, (b) is received by Licensee from a third party source, which source received the information without violation of any confidentiality restriction, (c) is independently developed by Licensee without violation of any confidentiality restriction, (d) is or becomes available to Licensee on an unrestricted basis from Licensor, or (e) is deemed responsive to a discovery demand in litigation, or in response to a lawfully issued subpoena, provided that such disclosure is made pursuant to a "confidential" and/or "attorneys eyes only designation" as provided for in the protective order governing said litigation.

-9-

## 8. **Term and Termination**.

      8.1   Term. This Agreement shall be for a continuous term beginning on the Effective Date and continuing until terminated pursuant to Section 8.2 or Section 8.3 (the time period from the Effective Date through the effective date of termination, the "*Term*").

      8.2   Termination by Licensor. Without prejudice to any other rights which Licensor may have, Licensor can at any time terminate this Agreement, effective upon notice to Licensee, upon the occurrence of any of the following: (a) Licensee does any act to bring the Licensed Marks into disrepute; (b) Licensee breaches any provision, representation or covenant of this Agreement; (c) Licensor reasonably determines that this Agreement violates any applicable laws, rules or regulations and the Parties cannot come into compliance with the laws; (d) the Products violate or allegedly violate any Intellectual Property Rights of a third party; (e) Licensee breaches any term or condition of this Agreement or the Usage Policy; or (f) Licensee's insolvency, which shall be defined as (i) Licensee's failure to pay its debts as they come due, (ii) when the fair market value of Licensee's assets are less than the value of Licensee's accrued liabilities, (iii) Licensee's assignment for the benefit of its creditors or any other unapproved assignment or transfer of Licensee's rights under this Agreement, or (iv) the placement of Licensee's assets in the hands of a trustee or receiver.

      8.3   Termination by Licensee. Licensee may terminate this Agreement effective upon notice to Licensee, upon the occurrence of any of the following: (a) Licensor no longer owns sufficient proprietary rights in the Licensed Marks; (b) Licensor materially breaches any provisions of this Agreement; or (c) Licensee reasonably determines that this Agreement violates any applicable laws, rules or regulations and the Parties cannot come into compliance with the laws.

      8.4   Effect of Termination. Upon termination of this Agreement, all rights and license in and to the Licensed Marks granted by Licensor to Licensee under this Agreement shall immediately terminate, subject only to any applicable Sell-off Period. Upon termination of this Agreement, Licensee agrees to: (a) immediately discontinue all use of the Licensed Marks, and any term confusingly similar to or dilutive of the Licensed Marks; (b) destroy all printed materials, marketing and promotional materials, and advertisements bearing the Licensed Marks; and (c) return all Confidential Information in its possession to Licensor. The foregoing notwithstanding, Licensee shall be permitted to continue to sell, existing inventories of Products bearing the Licensed Marks to a third party for a maximum of ninety (90) days following the termination of this Agreement (the "*Sell-Off Period*"). Licensee hereby agrees and acknowledges that Licensor would be unduly prejudiced and that the measure of actual damages suffered by Licensor would be difficult to ascertain, in the event that Licensee continued to sell Products bearing the Licensed Marks to any third party at any time after the expiration of the Grace Period. Therefore, Licensee agrees that for any sales of Products bearing the Licensed Marks to a third party after the expiration of the Grace Period, Licensor shall be entitled to collect liquidated damages in the amount of Two Thousand Five Hundred Dollars ($2,500) per day after the expiration of the Grace Period, which damages shall be in addition to, and not in lieu of, any other remedies available to Licensor under this Agreement. Licensee specifically agrees that such liquidated damages are reasonable and fair under the circumstances. Termination of this Agreement for any reason provided herein shall not relieve either Party from its obligation to perform up to the effective date of such termination or to

perform such obligations as may survive termination. The provisions of Sections 2, 3, 4, 7, 8.4, 9, 10, 11, and 12 of this Agreement shall survive any expiration or termination of this Agreement for any reason. Licensor shall not be liable to Licensee in connection with any costs, damages or losses of any kind as a result of the termination of this Agreement for any reason. Licensor shall have and hereby reserves all rights and remedies which it has or which are granted to it by operation of law or equity to enjoin the unlawful or unauthorized use of the Licensed Marks following any termination.

9. **Insurance**.

    9.1    Coverages. Throughout the Term of this Agreement, and for two (2) years thereafter, Licensee shall at its sole cost and expense obtain and maintain industry-standard insurance from an insurance company or companies having a Best's Financial Performance Rating of A and a minimum Financial Size Category of VII or higher. Such insurance shall be for Commercial General Liability Coverage including premises, operations, products and completed operations, contractual liability, independent contractors, and personal and advertising injury, with primary limits of at least: (a) One Million Dollars ($1,000,000) per occurrence for bodily injury and/or property damage; (b) Two Million Dollars ($2,000,000) in the general aggregate; and (c) Two Million Dollars ($2,000,000) products and completed operations aggregate, and with any general aggregate limit applying per project/per location and being unimpaired.

    9.2    General Terms. As of the Effective Date and annually upon renewal of each insurance policy, Licensee shall supply Licensor with a Certificate of Insurance with respect to each of the foregoing policies that names Licensor and any other Persons specified by Licensor as additional insureds, and which also provides that such insurance shall not be canceled or changed unless at least thirty (30) days' prior written notice has been given to Licensor. Licensee's insurance shall be primary and required to respond to and pay claims prior to other coverage. Licensee shall promptly pay all premiums required to be paid under each insurance policy and shall immediately furnish proof of such payment to Licensor upon Licensor's request. In no event shall Licensee utilize the Licensed Marks for commercial purposes in accordance with the terms and conditions of this Agreement prior to Licensee's provision to Licensor of evidence of the insurance policies required under this Section 9.

10. **Indemnification**.

    10.1    Indemnification Obligations. Licensee hereby agrees to assume complete and immediate responsibility for, and to immediately defend, indemnify and hold harmless Licensor, its Affiliates, and its and their respective directors, officers, employees, shareholders, members, agents, parents, subsidiaries, successors and assigns (collectively, "**_Indemnified Parties_**"), from any and all liabilities, claims, demands, causes of action, losses, expenses and damages (including, without limitation, reasonable attorneys' fees and settlement amounts) relating to or arising out of:

        (a)    any death or injury to any person or any property damage resulting or arising from, or alleged to have resulted or arisen from, any Products;

        (b)    any business, assets or properties owned, operated or managed by Licensee;

-11-

(c) Licensee's manufacture of any Products or the conduct of its business, including its manufacturing operations;

(d) any actual or threatened breach of any term or conditions of this Agreement;

(e) Licensee's actual or alleged violation of any of the laws of any governmental entity with respect to the Products;

(f) the acts or omissions of any subcontractors or vendors of Licensee; and

(g) anything else directly or indirectly relating to sourcing, manufacturing, packaging, distributing, providing, selling, re-selling, servicing and/or using the Products or the actual or alleged failure of the Products, including, without limitation, claims, demands, causes of action, losses and damages based upon Intellectual Property Rights or other proprietary rights of any third party, or alleged and claimed defects in the Products.

10.2 Indemnification Procedures. In connection with any claim, action, suit, proceeding or investigation for which any of the Indemnified Parties are seeking indemnification from Licensee, Licensor: (a) shall give Licensee notice of the claim, action, suit, proceeding or investigation; provided, however, that failure to provide such notice shall not relieve Licensee from its liabilities or obligations hereunder, except solely to the extent of any material prejudice as a direct result of such failure; (b) shall reasonably cooperate with Licensee, at Licensee's sole cost and expense, in connection with the defense and settlement of the claim, action, suit, proceeding or investigation; and (c) shall permit Licensee to control the defense and settlement of the claim, action, suit, proceeding or investigation; provided, however, that Licensee may not settle the claim, action, suit, proceeding or investigation without Licensor's prior written consent in the event such claim, action, suit, proceeding or investigation may adversely impact Licensor's Intellectual Property Rights, brand names, goodwill, rights or obligations. Further, Licensor, at its cost and expense, may participate in the defense of the claim, action, suit, proceeding or investigation through counsel of its own choosing. This Section shall survive the expiration or termination of this Agreement.

11. **Taxes**. Licensee shall be responsible for and shall pay all taxes and charges imposed by any government or taxing authority with respect to: (a) payments by Licensee to Licensor or the license rights granted to Licensee hereunder; (b) any business, assets or properties owned, operated or managed by Licensee; and (c) Licensee's manufacture of any Products or the conduct of its business, including its manufacturing operations.

12. **Miscellaneous Provisions**.

12.1 *General Covenants*. Licensee shall: (i) conduct business in a professional manner that reflects favorably at all times on the Licensed Marks and the good name, goodwill and reputation of the Licensed Marks and Licensor, (ii) avoid deceptive, misleading, fraudulent or unethical practices that are or might be detrimental to Licensor and the Licensed Marks, and (iii) make no false or misleading representations with regard to the Licensed Marks or Licensor.

-12-

12.2    Appointment as Non-Exclusive Distributor. Licensor agrees to appoint Licensee as one of its non-exclusive distributors of RooR-branded rolling papers and cones when such products are ready for release and distribution into the U.S. market.

12.3    Costs and Expenses. Except as expressly provided herein or agreed to in writing by the Parties, Licensee will pay all costs and expenses incurred in the performance of its obligations under this Agreement.

12.4    Independent Contractors. Neither Party will, for any purpose, be deemed to be an agent, partner or franchisee of the other Party. The relationship between the Parties will only be that of independent contractors. Neither Party will have any right or authority to assume or create any obligations or to make any representations or warranties on behalf of any other Party, whether express or implied, or to bind the other Party in any respect whatsoever.

12.5    Entire Agreement. This Agreement is the entire agreement between the Parties and supersedes all prior agreements, negotiations and communications of whatever type, whether written or oral, between the Parties or their predecessors-in-interest hereto with respect to the subject matter of this Agreement.

12.6    Amendment. This Agreement may be amended at any time by mutual agreement of the Parties without additional consideration, provided that, before any amendment will become effective, it will be reduced to writing and signed by the Parties.

12.7    Applicable Law. In the event of any dispute involving any matter between the Parties, whether arising out of this Agreement or otherwise, including any dispute involving the validity of this Agreement, the Parties shall first confer in good-faith by telephone or in person in an effort to resolve the dispute. This Agreement shall be interpreted and construed in accordance with the laws of the State of Illinois, without regard to its conflict of laws principles, and venue for any dispute under this Agreement shall lie exclusively in state or federal courts located in Cook County, Illinois. The Parties hereby consent to the jurisdiction and venue of such courts.

12.8    Prevailing Party Attorneys' Fees. Should any Party commence legal action to interpret or enforce the terms of this Agreement, the prevailing Party in such action shall be entitled to recover reasonable attorneys' fees and costs.

12.9    Remedies. Except as otherwise expressly provided in this Agreement, each and all of the rights and remedies provided in this Agreement, and each and all of the remedies allowed at law and in equity, will be cumulative, and the exercise of one right or remedy will not be exclusive of the right to exercise or resort to any and all other rights or remedies provided in this Agreement or at law or in equity.

12.10   Specific Performance. Licensee acknowledges that any breach of this Agreement may cause irreparable harm, the amount of which may be difficult to ascertain, and therefore agrees that Licensor shall have the right to seek and obtain injunctive relief against Licensee, and specific performance, without the necessity of posting a bond.

12.11   Assignment. Licensee will not assign or delegate any of its rights, obligations or licenses under this Agreement or this Agreement without the express prior written

-13-

consent of Licensor, and any such assignment or delegation is expressly prohibited and will be void unless Licensor has granted its express prior written consent in its sole discretion. This Agreement will be binding upon and inure to the benefit of the successors and permitted assigns of the Parties hereto. Licensor may assign or delegate its rights and obligations under this Agreement without notice to Licensee.

            12.12  Severability.  The provisions of this Agreement will be deemed severable and, if any portion will be held invalid, illegal or unenforceable for any reason, the remainder of this Agreement will be effective and binding upon the Parties.

            12.13  Waiver.  The failure of either Party to this Agreement to insist upon strict performance of any covenant or condition hereof, in any one or more instances, will not be construed as a waiver or relinquishment of any such covenant or condition, but the same will be and remain in full force and effect.

            12.14  No Third Party Rights.  Licensor does not intend the benefits of this Agreement to inure to any Third Party.

            12.15  Notices.  Unless otherwise provided, any notice or other communication required or permitted under this Agreement shall be given in writing and shall be deemed effectively given (a) upon personal delivery to the Party to be notified; (b) when received when sent by e-mail or fax by the Party to be notified; provided, however, that notices given by e-mail or fax shall not be effective unless either (i) a duplicate copy of such e-mail or fax notice is promptly given by one of the other methods described in this Section 12.15 or (ii) the receiving Party delivers a written confirmation of receipt for such notice either by e-mail, fax or any other method described in this Section 12.15; (c) one (1) business day after deposit with an express overnight courier for United States deliveries, or two (2) business days after such deposit for deliveries outside of the United States, with proof of delivery from the courier requested; or (d) three (3) business days after deposit in the United States mail by certified mail (return receipt requested) for United States deliveries. All notices for delivery outside the United States will be sent by facsimile, by e-mail or by express courier. Notices by facsimile shall be machine verified as received. All notices not delivered personally, by facsimile or by e-mail will be sent with postage and/or other charges prepaid and all notices shall be properly addressed to the Party to be notified at the address, or facsimile number as follows, or at such other address or facsimile number as such other Party may designate by one of the indicated means of notice herein to the other Party hereto as follows, or at such other address as such Party may designate by ten (10) days' advance written notice to the other Party given in the foregoing manner:

To Licensor:

        Sachin Lele
        General Counsel
        DRL Enterprises
        2301 Ravine Way
        Glenview, IL 60025
        E-Mail: slele@drl-ent.com

with a copy to (which shall not constitute notice)

Antony J. McShane
Neal Gerber & Eisenberg
2 N. LaSalle St., Suite 1700
Chicago, IL 60602
E-Mail: amcshane@nge.com

To Licensee:

Jay Faraj
Sream, Inc.
12825 Temescal Canyon Rd. Ste. B
Corona, CA 92883
E-Mail: jfarraj@sbcglobal.net

12.16  Construction of Agreement.  It is agreed by the Parties that the terms of this Agreement have been fairly bargained for after careful consideration by the Parties; therefore, this Agreement shall be enforced, interpreted and construed without regard to its authorship, and no inference shall be drawn by the Parties or any Third Party, including any court, by virtue of its authorship.

12.17  Opportunity to Consult with Counsel.  The Parties hereby represent and acknowledge that they have been provided with the opportunity to discuss and review the terms of this Agreement with their respective attorneys before signing it and that they are freely and voluntarily signing this document in exchange for the benefits provided herein.

12.18  Captions; Headings; References.  The captions or headings used herein are for reference and convenience only and shall not enter into the interpretation hereof. Any reference herein to a particular Section number shall be deemed a reference to all Sections of this Agreement that bear sub-numbers to the number of the referenced Section. Unless otherwise specified, "days" means calendar days. Any use of the term "including" in this Agreement shall be construed as if followed by the phrase "without limitation" or "but not limited to".

12.19  Counterparts; Electronic Signature.  This Agreement may be executed in counterparts, each of which will be deemed an original, and all of which together constitute one and the same instrument. To expedite the process of entering into this Agreement, the Parties acknowledge that Transmitted Copies of this Agreement will be equivalent to original documents until such time as original documents are completely executed and delivered. "*Transmitted Copies*" means copies that are reproduced or transmitted via photocopy, facsimile or other process of complete and accurate reproduction and transmission.

[*Remainder of page intentionally left blank*]

-15-

IN WITNESS WHEREOF the Parties hereto have duly executed and delivered this License Agreement as follows:

**LICENSEE:**        **Sream, Inc.**

By:_____

Name:_____ **Uarir farraj** _____

Title:__ **President** _____

**LICENSOR:**        **Republic Technologies (NA), LLC**

By:_____ _Kadin Vk_ _____

Name:_____ Sachin Lek _____

Title:_____ VP - Legal _____

**Schedule A**
**Licensed Marks**

| Licensed Marks | Registration No. |
|---|---|
|  | 2235638 ® |
|  | 2307176 ® |
|  | 3675839 ® |
|  | (common law) TM |

**Schedule B**
**Licensed Articles**

1.    Glass bowls; glass boxes; glass casters; glass beverageware and bowls; glass rods, stoppers, glass tubes not for scientific purposes

2.    Glass pipes; glass bongs; glass water pipes; water pipes; water pipe cleaner

3.    Glass water pipers, bubblers, and ash catchers

4.    Glass ash trays, grass trays, glass down stem bowls and glass straws

5.    Carry bags expressly for use with glass pipes and bongs

**Schedule C**
**Usage Policy**

**Advertising and Collateral Material**

All advertising and collateral materials must be produced in strict accordance with the Agreement and this Usage Policy. Use of any logos, logotypes, taglines, icons, illustrations or Product photos must be pursuant to the Agreement, and in conformance with this Usage Policy. All materials must be submitted to Licensor and approved in writing prior to any use or distribution thereof and must comply with the following:

Visual Requirements

(a)     In the use of illustrations and photographs, if a particular style is featured, a correct Product name must accompany the illustration or photo.
(b)     Use of ROOR logo is required in any and all advertisements.

Pricing

If an advertisement (or collateral materials) contains pricing information, it must be current and accurate.

**Packaging**

All Products must he sold in packaging approved by Licensor. Notwithstanding the foregoing, Licensor agrees that compliant packaging currently being used as of the Effective Date can continue to be used.

**Trademarks**

Proper Trademark Use

Licensee must comply with the following usage guidelines whenever using any Trademark:

(a)     Always use the trademarks exactly (as set forth in Schedule A) without varying spelling or spacing, abbreviating, adding or deleting hyphens, breaking into two or more words, combining marks, pluralizing, making possessive or otherwise altering the marks in any manner.
(b)     Keep Licensed Marks visually distinct from other text, images or materials. Capitalizing, bolding, italicizing and using a logotype are common ways of accomplishing this.
(c)     Provide a proper Trademark notice as described herein

Proper Notice

A proper trademark symbol must be used in connection with all Licensed Marks. Depending on the trademark's status, there are two proper notices for the Licensed Marks:

> (a) ® indicates a trademark registered in the United States.

> (b) ™ indicates a trademark that is not registered, but used as a trademark.

The appropriate notice for each of the Licensed Marks as of the latest update of this Usage Policy is set forth in the Trademark chart attached hereto as Schedule A. If marks currently listed in the chart with a ™ become registered, they will be updated with the ® symbol in the next revision of this Usage Policy.

The ® or ™ symbol, as appropriate, should appear in the upper right corner of the mark (in the same location a footnote number would appear). It should be used at a minimum the first time a mark appears in text and in all prominent usages in which the mark is set apart from other text. Every appearance of a logo or logotype or a Trademark used on any Product packaging should always be marked with the appropriate Trademark symbol.

Use of Logos, Logotypes, Brand Icons, Symbols, Illustrations and Product Photographs

All use of any Brand logos, logotypes, brand icons, symbols and illustrations and the use of any photographs of Products must be used under the terms of the Agreement and in strict accordance with the provisions of this Usage Policy. Licensee may not modify, crop, distort, morph or animate any such item in any manner without the express written permission of Licensor in each instance.

Use of Mark within Company Name or Domain Name

Registration and/or use of a business name or assumed business name which is comprised of any Trademark in any way, shape or form is strictly prohibited. Registration and/or use of a domain name wherein the second level is comprised of any Trademark in any way, shape or form is also strictly prohibited, except with the prior written approval of Licensor.

## **Intellectual Property Protection and Indemnification.**

### Protection

Licensee agrees to immediately notify Licensor in writing of any infringement, misappropriation or violation of any patent, copyright, trademark, trade secret or other proprietary right of Licensor that comes to Licensee's attention. In the event of any such infringement, misappropriation or violation relating to Licensee's activities or any activities of Licensee's employees, agents, representatives, distributors, dealers, sales representatives or customers, Licensee agrees to take all steps reasonably necessary to terminate any such infringement, misappropriation or violation. Licensor will have exclusive control over the prosecution and settlement of any legal proceeding to enforce, to recover damages on account of any infringement, misappropriation or violation of,

or to defend any of its proprietary rights. Licensee agrees to: (a) provide such assistance related to such proceeding as Licensor may reasonably request; and (b) assist Licensor in enforcing any settlement or order made in connection with such proceeding.

## Third Party Consents

To the extent that Licensee sells, references or identifies any products and/or services, or utilizes any trademark, service mark, trade name, trade dress, logo, logo type, tagline, icon or any other intellectual property (registered or unregistered) with respect to any products and/or services of any third party ("*Third Party Content*"), Licensee hereby represents and warrants that: (i) its use of the Third Party Content does not and will not violate, misappropriate or infringe any copyright, patent, trademark, service mark, trade secret or any other personal, privacy or moral right or any other Intellectual Property Right arising under the laws of any jurisdiction of any third party person or entity; (ii) Licensee has obtained any and all necessary consents for the use of the Third Party Content; and (iii) Licensee will not place Third Party Content within close proximity to the Licensed Marks or Licensor content, or otherwise directly or indirectly imply or use the Licensed Marks or Licensor content to imply Licensor's sponsorship, affiliation, or endorsement of Third Party Content.

## **General Rules**

- Licensee acknowledge that all rights in and to the Licensed Marks are the sole and exclusive property of Licensor and that all goodwill generated through Licensee's use of any of the Licensed Marks shall insure solely to the benefit of Licensor.

- Licensee may not use any logo, logotype, icon, photograph or illustration of Licensor unless specifically authorized in the Agreement.

- Licensee may not copy or publish the Licensed Marks, except as expressly authorized by Licensor herein or in the Agreement. Under no circumstances may Licensee license, sublicense, assign, sell or otherwise transfer any right conferred to Licensee to use the Licensed Marks, without the prior written consent of Licensor. Licensee may not alter the Licensed Marks in any manner, including size, proportions, colors, elements, additions, etc., or animate, morph or otherwise distort or modify its perspective or appearance, without Licensor's prior written consent.

- All use of the Licensed Marks is subject to review and approval by Licensor, and this Usage Policy is not intended to be a complete statement of Licensor's requirements regarding proper Trademark usage. Licensor reserves the right to object to and disapprove of any use of its Licensed Marks that it deems to be undesirable, improper, even if such use is not expressly prohibited by this Usage Policy or the Agreement.

- Licensee's use may not be obscene or pornographic, and may not be disparaging, defamatory or libelous to Licensor or any other person, product or entity.

- Licensee's use may not infringe any of Licensor's Intellectual Property Rights or other rights, may not violate any state or federal laws, and must comply with international intellectual property laws.

- Licensee agree to Licensor's periodic inspection of Licensee's use of the Licensed Marks as necessary to confirm such use conforms to this Usage Policy. Any non-conforming use must immediately be brought into conformance. Alternatively, Licensor may, at its sole and absolute discretion, elect to terminate all rights of use of its Licensed Marks, as well as the Agreement.

- Licensor may from time to time, in its sole discretion, update the Licensed Marks to include other content, including other or new Licensed Marks, terms, format and design (the *"New Content"*). The same terms set forth herein shall apply to any New Content. Licensee shall use the New Content and discontinue use of any outdated Licensed Marks.

**Schedule D**
**Gross Sales Requirements**

| Year | Minimum Gross Sales (in U.S. Dollars) |
|------|---------------------------------------|
| 2019 | 500,000 |
| 2020 | 500,000 |
| 2021 | 525,000 |
| 2022 | 551,250 |
| 2023 | 578,813 |
| 2024 | 607,753 |
| 2025 | 638,141 |
| 2026 | 670,048 |
| 2027 | 703,550 |
| 2028 | 738,728 |
| 2029 | 775,664 |
| 2030 | 800,000 |

For any years of the Term after 2030, the minimum Gross Sales requirement shall be eight hundred thousand dollars ($800,000 USD).